MARKMAN, J.
(dissenting). Following a jury trial, defendant was convicted of first-degree murder. However, the trial court granted defendant’s motion for a new trial because the jury was misinformed regarding the extent of the immunity granted to a witness in exchange for that witness’s testimony against defendant. After the first trial, but before the second trial, two witnesses, in signed written statements, recanted the testimony that they had provided in the first trial against defendant. Although the trial court admitted these witnesses’ testimony from the first trial, the trial court excluded their recanting statements. Following a second jury trial, defendant was again convicted of first-degree murder. The Court of Appeals reversed and remanded for a new trial, concluding that the trial court had abused its discretion in excluding the recanting statements and that the error was not harmless. The majority here today reverses the Court of Appeals, concluding that the trial court did not abuse its discretion in excluding the statements and that any error was harmless. Because I agree with the Court of Appeals that the trial court abused its discretion in excluding the statements and that this error was not harmless, I dissent.
I. FACTS AND PROCEDURAL HISTORY
In 2001, following a jury trial, defendant was convicted of first-degree murder for the shooting death of Charles Miller in 1988. During this first trial, Guy Simpson, an alleged accomplice who was given full *475 immunity in exchange for his testimony against defendant, testified that defendant, Charles Lamp, and he were present when Miller was shot, but that defendant was the one who actually shot Miller.[1] He also testified that defendant cut off Miller’s ear and that defendant had told him that he needed to show Miller’s ear to Benny Williams, a local drug dealer. Simpson admitted that he had, in the past, told several different versions of the events, including one in which only he and Lamp, and not defendant, were involved in Miller’s death. However, a police officer testified that Simpson’s version of the events had always been the same— defendant was the shooter — on the occasions that he had interviewed Simpson. Simpson also confirmed that Lamp had, in the past, threatened to kill him if he endangered Lamp’s plea agreement in any way. Finally, Simpson testified that defendant had an affair with Lamp’s wife.
Lamp, who testified pursuant to a plea agreement under which he pleaded guilty of manslaughter and received a 10- to 15-year sentence, also testified that defendant shot Miller while Lamp and Simpson were present, and that defendant cut off Miller’s ear. Lamp further testified that defendant killed Miller for Williams. He admitted that he had once threatened to kill Simpson if Simpson talked to the police. Lamp eventually took the police to the location where Miller’s remains were found.
*476 Darlene Zantello, defendant’s girlfriend at the time of the murder but no longer so at the time of the trial, testified that when she arrived home on the night of the murder, nobody was there; defendant and Simpson arrived later, and she heard them talking about blowing someone’s head off and cutting someone’s ear off. She also testified that about a year or two later, while they were all drinking, she heard defendant say to Rebecca Mock, Miller’s girlfriend at the time of his death, that he was sorry that “they did what they did,” although he did not say that he was the one who did it. On cross-examination, Zantello denied that she had initially told the police that defendant was at home when she arrived there and that defendant was not involved in Miller’s death.
Rebecca Mock and her sister, Roxann Barr, testified that one night when they were all drinking, defendant admitted being present when Miller was killed. However, Mock and Barr offered differing accounts of what exactly defendant said, including whether he stated that he killed Miller.[2]
Three of defendant’s sisters supported his alibi defense. They all testified that he was at home on the night that Miller was killed. According to Lamp and *477 Simpson, defendant killed Miller for Williams, but Williams testified that he did not know Miller or anything about Miller’s death, and there is no evidence linking Williams to Miller. In fact, a police officer testified that the police had concluded that Williams was not involved in the murder. Finally, contrary to the testimony of Simpson and Lamp, the police testified that there was no physical evidence indicating that Miller’s ear had been cut off.
After the first trial, the trial court granted defendant’s motion for a new trial because the jury had been misinformed regarding the extent of the immunity that was granted to Simpson in exchange for his testimony against defendant. After the first trial, but before the second trial, Simpson and Zantello provided signed and written statements recanting the testimony that they had presented against defendant at his first trial.
Simpson’s signed and written statement explained that Lamp was the one who shot Miller, and that defendant was not even present when Lamp did so. Simpson stated that defendant was at home when he left with Miller and Lamp, and that defendant was still at home when Lamp dropped him off at defendant’s house later that evening after Lamp shot Miller in front of Simpson. As far as he knew, defendant was at home that entire evening. Simpson further stated that the prosecutor threatened to charge him with obstruction of justice if he did not testify against defendant, but promised him “full immunity” if he testified against defendant, even though Simpson asserted that he told the prosecutor that defendant was innocent. He also explained that all his statements to the police implicating defendant were given while he was incarcerated for unrelated crimes and were given to benefit himself while he was facing criminal charges. Finally, he ex *478 plained that he was not making these statements because of his friendship with defendant, as he had not seen defendant in over 11 years.
Similarly, Zantello explained in a signed written and notarized affidavit that the first statement that she gave to the police was the truth; that is, defendant was at home when she arrived home that evening and she did not know anything about Miller’s murder. She explained that about 10 months after the murder, she was arrested for disorderly conduct and was instructed to implicate defendant in Miller’s murder. She further explained that her boyfriend at the time of defendant’s first trial, Robert Lowder, was released from jail even though he had two felony charges pending against him. Lowder told her that if she testified against defendant, he would not go to prison for his felony charges. The prosecutor in charge of Lowder’s case was also the prosecutor in charge of defendant’s case, and she was afraid of Lowder. The two felony charges pending against Lowder were for beating her. Finally, she admitted that she never overheard any conversations about Miller’s murder, and that defendant had always told her that he was not involved in Miller’s murder.[3]
At defendant’s second trial, the court ruled that Simpson and Zantello were unavailable on the basis of their unwillingness to testify and alleged memory problems.[4] Although the trial court admitted these wit *479 nesses’ testimony from the first trial as prior testimony of unavailable witnesses under MRE 804(b)(1), it excluded their subsequent recanting statements. In 2002, following a second jury trial, defendant was again convicted of first-degree murder.
The trial court denied defendant’s motion for a new trial, holding that although the witnesses’ recanting statements were admissible under MRE 806, they were properly excluded under MRE 403.[5] The Court of Appeals subsequently reversed and remanded for a new trial. People v Blackston, unpublished opinion per curiam of the Court of Appeals, issued January 18, 2005 (Docket No. 245099). In response to the prosecutor’s application for leave to appeal, this Court vacated the Court of Appeals judgment and remanded to the Court of Appeals “for reconsideration of the issue whether the trial court’s error, if any, in excluding the statements in question was harmless beyond a reasonable doubt.” 474 Mich 915 (2005). This Court further stated, “The court *480 should fully evaluate the harmless error question by considering the volume of untainted evidence in support of the jury verdict, not just whether the declarants were effectively impeached with other inconsistent statements at the first trial.” Id.
On remand, the Court of Appeals held that the error was not harmless beyond a reasonable doubt, and, thus, again reversed and remanded for a new trial. People v Blackston (On Remand), unpublished opinion per curiam of the Court of Appeals, issued May 24, 2007 (Docket No. 245099). In response to the prosecutor’s second application for leave to appeal, we ordered and heard oral argument on whether to grant the application or take other peremptory action. 480 Mich 929 (2007). The majority now reverses the Court of Appeals.
II. STANDARD OF REVIEW
A trial court’s decision to exclude evidence is reviewed for an abuse of discretion. Elezovic v Ford Motor Co, 472 Mich 408, 419; 697 NW2d 851 (2005). A trial court’s decision to deny a motion for a new trial is likewise reviewed for an abuse of discretion. Barnett v Hidalgo, 478 Mich 151, 158; 732 NW2d 472 (2007). The court abuses its discretion when it chooses an outcome falling outside the principled range of outcomes. People v Babcock, 469 Mich 247, 269; 666 NW2d 231 (2003).
I agree with the majority that it is unnecessary to determine whether the error here was preserved, constitutional error or unpreserved, non-constitutional error. However, unlike the majority, I reach this conclusion because I believe that even assuming that the error was unpreserved, non-constitutional error, and thus that the most difficult standard for defendant to satisfy is applicable, the error here was not harmless and defendant is entitled to a new trial. As will be discussed *481 more thoroughly in part III(B), assuming that the error is unpreserved, non-constitutional error, defendant must satisfy the plain-error standard of review, which requires him to establish (1) that there was error, (2) that the error was plain, (3) that the error affected the outcome of the lower court proceeding, and (4) that the error resulted in the conviction of an actually innocent defendant or that the error “ * “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings” People v Carines, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (citation omitted). In my judgment, he has clearly satisfied even this standard.
III. ANALYSIS
A. EXCLUSION OF EVIDENCE
As discussed earlier, although the trial court admitted Simpson’s and Zantello’s testimony from the first trial, it excluded their subsequent recantations. I agree with the Court of Appeals that the trial court abused its discretion when it excluded this evidence. MRE 806 provides:
When a hearsay statement, or a statement defined in Rule 801(d)(2)(C), (D), or (E), has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes if declarant had testified as a witness. Evidence of a statement or conduct by the declarant at any time, inconsistent with the declarant’s hearsay statement, is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain. If the party against whom a hearsay statement has been admitted calls the declarant as a witness, the party is entitled to examine the declarant on the statement as if under cross-examination. [Emphasis added.]
*482 MRE 806 specifically states that when hearsay statements are admitted, the credibility of the declarant may be attacked by any evidence that would have been admissible if the declarant had testified. It is undisputed that if Simpson and Zantello had testified against defendant at his second trial, the statements at issue here would have been admissible as prior inconsistent statements.[6]
At the motion for a new trial, the trial court agreed that the recanting statements were admissible under MRE 806, but concluded that the statements were “more prejudicial [than] probative,” and, thus, were properly excluded under MRE 403. MRE 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed hy the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
“Evidence is not inadmissible simply because it is prejudicial. Clearly, in every case, each party attempts to introduce evidence that causes prejudice to the other party.” Waknin v Chamberlain, 467 Mich 329, 334; 653 NW2d 176 (2002). “ ‘ “Relevant evidence is inherently *483 prejudicial; but it is only unfair prejudice, substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403 Id. (citations omitted). “In this context, prejudice means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contentions, but that cannot be grounds for exclusion.” People v Vasher, 449 Mich 494, 501; 537 NW2d 168 (1995). MRE 403 “ ‘ “is not designed to permit the court to ‘even out’ the weight of the evidence ... or to make a contest where there is little or none.” ’ ” Waknin, 467 Mich at 334 (citations omitted). Instead, the rule only prohibits evidence that is unfairly prejudicial. “Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury.” People v Crawford, 458 Mich 376, 398; 582 NW2d 785 (1998).
Given that the excluded evidence at issue here would have impeached two critical prosecutorial witnesses, this evidence cannot possibly be considered “marginally probative evidence,” and, thus, cannot possibly be considered “unfairly prejudicial.” Therefore, the trial court’s holding to the contrary “fall[s] outside th[e] principled range of outcomes,” Babcock, 469 Mich at 269, and thus constitutes an abuse of discretion.
Where a Michigan rule of evidence is modeled after its federal counterpart, it is appropriate to look to federal precedent for guidance, People v Barrera, 451 Mich 261, 267; 547 NW2d 280 (1996), although the latter is never dispositive. Both MRE 806 and MRE 403 are identical to their federal counterparts. In United States v Grant, 256 F3d 1146 (CA 11, 2001), a co-conspirator, Deosie Wilson, made statements during the conspiracy to an undercover police officer that impli *484 cated the defendant. Subsequently, Wilson signed an affidavit stating that the defendant was not involved in the crimes. The trial court admitted Wilson’s statements to the undercover police officer, but excluded Wilson’s subsequent affidavit. Id. at 1152-1153. The Eleventh Circuit Court of Appeals reversed, concluding that the affidavit was admissible under FRE 806 and could not be excluded under FRE 403. That court explained:
Rule 403 is an “extraordinary remedy,” whose “major function ... is limited to excluding matter[s] of scant or cumulative probative force, dragged in by the heels for the sake of [their] prejudicial effect.” The Rule carries a “strong presumption in favor of admissibility.” Wilson’s inculpatory co-conspirator statements were important pieces of evidence in the government’s case. The impeaching statements in the affidavit would serve to cast doubt on Wilson’s credibility and would have significant probative value for that purpose. Whatever prejudice to the government that might occur from admitting the affidavit statements could not substantially outweigh their probative value, anymore than it could if those affidavit statements had been admitted for impeachment following live testimony of Wilson to the same effect as his co-conspirator statements. [Id. at 1155 (citations omitted).]
In Vaughn v Willis, 853 F2d 1372 (CA 7, 1988), plaintiff Terry Vaughn, an inmate, testified that defendant Henry Willis, a guard, helped several inmates rape Vaughn. Alvin Abrams, another inmate, testified during a deposition that he saw Willis help the inmates rape Vaughn. Before the trial in this civil action, Abrams wrote a letter to Willis’s attorney stating that he would not testify at the trial and that he had made some mistakes during his deposition. Subsequently, Abrams was allowed to correct the mistakes made in his deposition, which simply pertained to the sequence in which the assailants entered Vaughn’s cell, and again swore to *485 the truthfulness of the deposition testimony. However, at trial, Abrams refused to testify, stating, in the absence of the jury, that he would not testify because he feared for his life, as well as the lives of his family. Id. at 1377-1378. The trial court admitted Abrams’s deposition testimony, but excluded Abrams’s letter to Willis’s attorney on the basis that “the possibility of prejudice far outweighed any probative value the letter might have.” Id. at 1379.
The Seventh Circuit Court of Appeals affirmed the trial court’s decision to exclude the letter for several reasons. First, the letter’s probative value was minimal because it was “very ambiguous.” Id. at 1379. Second, the letter had the potential of confusing the jury because it referred to mistakes that the witness had made in his prior testimony, but those mistakes pertained only to irrelevant details and had subsequently been corrected. Id. at 1380. The court’s third reason for affirming the trial court’s decision to exclude the letter was that the witness did not want this letter disclosed because he “fear[ed] for his safety and that of his family.” Id.
In the instant case, the trial court held that Vaughn is “more akin to our case in the sense that, although it wasn’t prior trial testimony, it was prior testimony given in a deposition where there was a full right to cross examine, and the subsequent statement was a letter.” I respectfully disagree. Both Grant and the instant case involve a statement by a witness/accomplice followed by a recanting statement by that same witness/accomplice. Vaughn, on the other hand, involved a statement by an eyewitness, not an alleged accomplice, followed by a letter refusing to testify, not a recanting statement. Unlike the statements in Grant and in the present case, the letter in *486 Vaughn did not assert that the witness’s earlier statement was untrue. The probative value of the letter in Vaughn does not even remotely compare to the probative value of the subsequent recanting statements in Grant and in the present case because in the latter cases, the witnesses expressly stated that their previous statements were untrue. Furthermore, unlike the letter in Vaughn, the recanting statements at issue in Grant and in the instant case were not at all ambiguous. To the contrary, they very clearly stated that the previous statements were untrue. In addition, unlike Vaughn, neither Grant nor the instant case involves a witness who wants his subsequent statement excluded because he fears for either his own or his family’s safety.
Grant and the instant case are similar in another respect. In Grant, the prosecutor argued that the subsequent statement should be excluded because it would provide a “complete defense” and because it was “particularly unreliable.” Grant, 256 F3d at 1155. Similarly, in the instant case, the trial court excluded the subsequent statements because they were an “advocacy for acquittal” and because the witnesses’ “manipulative nature” made him “skeptical.” However, the court in Grant rejected these arguments, stating:
The evidence of the affidavit statements could do no more than impeach and could not provide “a complete defense” if the government requested the limiting instruction to which it would have been entitled. See Weeks v. Angelone, 528 U.S. 225, 234, 120 S.Ct. 727, 733, 145 L. Ed.2d 727 (2000) (“A jury is presumed to follow its instructions.”).
The government’s second fallback argument is that Wilson’s affidavit statements were properly excluded from evidence because they were particularly unreliable.... The government maintains that because the statements in *487 the affidavit were so unreliable, admitting them would not have affected the outcome of the trial — sort of a harmless error argument.
The government’s argument on this point is more than a little inconsistent with its Rule 403 argument that the affidavit statements were terribly prejudicial to its case. Putting that inconsistency aside, however, Rule 806 made the statements admissible for impeachment purposes, and the point of admitting inconsistent statements to impeach is not to show that they are true, but to aid the jury in deciding whether the witness is credible; the usual argument of the parly doing the impeaching is that the inconsistent statements show the witness is too unreliable to be believed on important matters. See United States v. Graham, 858 F.2d 986, 990 n. 5 (5th Cir.1988) (“[T]he hallmark of an inconsistent statement offered to impeach a witness’s testimony is that the statement is not hearsay within the meaning of the term, i.e., it is not offered for the truth of the matter asserted, see Fed.R.Evid. 801(c); rather, it is offered only to establish that the witness has said both ‘x’ and ‘not x’ and is therefore unreliable.”). Given all the circumstances of this case, that strategy might well have worked to undermine the probative effect of Wilson’s co-conspirator statements to such an extent that the verdict on the conspiracy charge would have been different. For that reason, we reverse Grant’s conviction on that charge. [Id. at 1155-1156.][7]
These same arguments should likewise be rejected in this case. The subsequent statements here are not admissible to prove that defendant was not the shooter. Instead, they are admissible to show that two of the prosecutor’s witnesses are not credible. As the Court of Appeals explained:
*488 [T]he statements were not offered to prove the truth of what was in them, but to attack the witnesses’ credibility. As in Grant, the very reason the court excluded the statements, because it questioned the veracity and credibility of the witnesses, made the statements all the more probative on the credibility issue. Defendant should have been free to show the jury that the witnesses were unworthy of belief. Credibility is always a question for the jury, and the court erred in concluding that it would have been proper to insulate the jury from the witnesses’ contradictory statements. [Blackston (On Remand), supra at 7-8.]
The probative value of the recanting statements was not substantially outweighed by the danger of unfair prejudice under MRE 403. The probative value of these statements is evinced by the fact that there is a specific rule of evidence, MRE 806, that provides that this very kind of evidence, i.e., evidence attacking the credibility of a declarant when that declarant’s hearsay statement is being used against the defendant, is admissible. The probative value of these recanting statements was especially significant, given that the prior testimony of these two witnesses was obviously extremely damaging. The only “unfair prejudice” at issue in this case was caused by the trial court’s exclusion of the recanting statements, because it resulted in the jury being painted a false picture. If the recanting statements had been placed before the jury, the prosecutor would, of course, have been free to argue to the jury that the recanting witnesses had manufactured their testimony. However, the jurors were told instead that one witness previously testified that defendant was the shooter and the other one testified that she overheard defendant and a co-defendant talking about blowing somebody’s head off without being informed that the first witness subsequently stated that defendant was not even present when the victim was killed and that the second witness subsequently stated that she never heard de *489 fendant talking about the murder. This was critical evidence of which the jury, in fairness, should not have been deprived. For these reasons, I agree with the Court of Appeals that the trial court abused its discretion in excluding the recanting statements.[8]
B. HARMLESSNESS OF ERROR
I also agree with the Court of Appeals that the error was not harmless. Simpson testified that defendant was the shooter. However, Simpson testified against defendant in exchange for full immunity; before testifying at the first trial, he indicated that he wanted to testify truthfully but was concerned that he would be charged with perjury if his testimony conflicted with his previous statement; Simpson has told several different versions of the events; in his very first statement to the police, Simpson said that Lamp was the shooter and that defendant was not even there, which is consistent with his most recent statement; Simpson testified that defendant cut off Miller’s ear, but the police testified that there was no physical evidence indicating that Miller’s ear had been cut off; Simpson testified that defendant killed Miller for Williams, but Williams testified that he did not even know Miller and the police indicated that there was no evidence that Williams was in any way involved with Miller’s death; and Lamp threat *490 ened to kill Simpson if he said anything to the police to endanger his plea agreement, a threat on which Simpson believed Lamp would follow through.
Lamp also testified that defendant shot Miller. However, Lamp also testified against defendant in exchange for a plea agreement; Lamp testified that defendant cut off Miller’s ear, but the police testified that there was no physical evidence indicating that Miller’s ear had been cut off; Lamp testified that defendant killed Miller for Williams, but Williams testified that he did not even know Miller, and the police indicated that there was no evidence that Williams was in any way involved in Miller’s death; Lamp threatened to kill Simpson if he said anything to the police to endanger his plea agreement; defendant had an affair with Lamp’s wife; and, finally, Simpson has stated that Lamp shot Miller.
Zantello testified that defendant was not at home when she arrived at home and that she overheard defendant and Simpson talking about blowing off somebody’s head. However, in her veiy first statement to the police she said that defendant was home when she arrived there and that defendant was not involved in Miller’s murder, which is consistent with her most recent statement; and she testified that she overheard defendant and Simpson talking about cutting off somebody’s ear, but the police testified that there was no physical evidence indicating that Miller’s ear had been cut off.
Mock testified that defendant told her that he shot Miller. However, Mock was a suspect in Miller’s murder; Barr, who witnessed the same conversation, testified that defendant did not say that he was the shooter[9] and that they were all drunk when this confession allegedly *491 occurred; and, finally, Mock testified that defendant said that he cut off Miller’s ear, but Barr testified that she did not think that defendant said anything about cutting Miller’s ear off, and the police testified that there was no physical evidence indicating that Miller’s ear had been cut off.
There are also inconsistencies between the testimonies of Lamp, Simpson, Mock, and Zantello regarding who showed up when at defendant’s house on the night that Miller was murdered. See note 2, supra. Finally, three of defendant’s sisters testified that defendant was home the night that Miller was killed.
The evidence against defendant, in other words, was anything but overwhelming. All the prosecutor’s witnesses had compelling motives to lie. Simpson, Lamp, and Mock were all suspects. Zantello was defendant’s ex-girlfriend and, according to Zantello, her then-current boyfriend, who beat her, forced her to testify against defendant because the prosecutor — the same prosecutor prosecuting defendant’s case — allegedly promised the boyfriend no prison time if she did so. Under these circumstances, excluding Simpson’s and Zantello’s written statements that indicated that defendant was innocent was not harmless error. These statements could very well have caused the jury to have reasonable doubt about defendant’s guilt.
The prosecutor argues that the recanting statements are cumulative because the jury already heard evidence that Simpson and Zantello had made prior inconsistent statements. However, Zantello’s earlier inconsistent statement made to the police just after the incident and while she was still living with defendant did not under *492 mine her first trial testimony to the extent that her later written statement would have. As the Court of Appeals explained:
The jury heard evidence that Zantello’s first statements to police were that defendant was home when she returned from the hospital, and that she knew nothing about Miller’s disappearance except that defendant was not involved. However, these statements were given shortly after Miller’s disappearance, and when Zantello was living with defendant. The jury could have easily decided that the earlier inconsistent statements did not undermine the trial testimony, reasoning that Zantello had given a statement in March, 1990 that incriminated defendant, and that at the time of trial, Zantello was no longer involved with defendant, and was therefore no longer willing to lie in his behalf. The fact that Zantello reaffirmed her earlier position shortly before the second trial would have undermined her trial testimony in a way that the earlier statements could not. [Blackston (On Remand), supra at 8.]
In addition,
[Regarding Simpson, although he was impeached with having given prior inconsistent versions of what happened to Miller, as set forth above, and he admitted at the first trial that he had told Jody Harrington shortly after the shooting that only he and Lamp were involved, he also admitted telling police that he never made such a statement to Harrington. Further, Detective Sergeant Averill testified that Simpson had remained consistent in the version of events he claimed to have witnessed, and stated that Simpson’s testimony at defendant’s first trial had been consistent with this version of events. Had Simpson’s inconsistent written statement ... been admitted under MRE 806, the jury would have had a very different view of Simpson’s credibility. [Id.]
Because the evidence against defendant is by no means overwhelming, and because the excluded evi *493 dence was significantly probative, I agree with the Court of Appeals that the error here was not harmless.
Even assuming that the issue was not properly preserved because, although defendant objected to the exclusion of the evidence on the basis of MRE 613, he did not object on the basis of MRE 806, MRE 103(d) provides that unpreserved “plain errors affecting substantial rights” can be raised for the first time on appeal.[10] As discussed in part II, in order for a defendant to obtain relief for an unpreserved error, the defendant *494 must establish (1) that there was an error, (2) that the error was plain, (3) the error affected the outcome of the lower court proceedings, and (4) the error resulted in the conviction of an actually innocent defendant or that it “ ‘ “seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings”____’ ” Carines, 460 Mich at 763 (citation omitted). Because Simpson’s and Zantello’s recanting statements are clearly admissible under MRE 806, and should not have been excluded under MRE 403, there was error, and the error was plain. Because the evidence against defendant was by no means overwhelming, the exclusion of the recanting statements of the prosecutor’s two critical witnesses may very well have been outcome determinative, and the error may have resulted in the conviction of a defendant who was actually innocent.
Alternatively, the error certainly and seriously affected the fairness, integrity, and public reputation of the judicial proceeding. The jury was affirmatively apprised that two witnesses previously testified against the defendant (one testified that he saw defendant *495 shoot Miller and the other testified that she heard defendant talking about shooting Miller), but it was never told that these witnesses subsequently signed written statements indicating that defendant was actually innocent. By restricting the jury’s access to all of the available evidence, the trial court presented the jury with a highly distorted view of the state of the evidence against defendant and thereby deprived the defendant, and the community, of a fair trial. Therefore, even assuming that the issue is unpreserved, there was plain error requiring reversal.
IV CONCLUSION
The trial court abused its discretion in allowing the jury to hear the hearsay testimony of two critical witnesses, while excluding their recanting statements, and in denying defendant’s motion for a new trial. Therefore, I would affirm the judgment of the Court of Appeals that reversed the trial court and remanded this case for a new trial.
CAVANAGH and KELLY, JJ., concurred with MARKMAN, J.

 Before Simpson testified, Simpson stated that his previous statement under oath against defendant, pursuant to an investigative subpoena, was not truthful, and that he now wanted to testify truthfully, but he was concerned that if he did so he could be charged with perjury. When the court instructed him that he, indeed, could be charged with perjury if he testified differently from his previous statement, Simpson stated, “[S]o, it’ll put a hindrance on my testimony today.” Neither the jury at the first trial nor the jury at the second trial was privy to this conversation.

 Mock testified that defendant said that he was the shooter, but Ban-testified that defendant did not admit to being the shooter. In addition, Mock testified that defendant said that he cut off Miller’s ear, but Barr testified that she did not think that defendant said anything about cutting off Miller’s ear. Both Mock and Ban admitted that Mock had been a suspect in Miller’s murder.
In addition, Lamp testified that when he arrived at defendant’s house, Simpson was already there and Miller anived later. However, Simpson testified that when he arrived at defendant’s house, Miller was there, and Lamp arrived later. Meanwhile, Mock testified that defendant and Lamp came to her house to pick Miller up, but that Miller was not ready then, so he went to defendant’s house later. Finally, Zantello testified that Simpson was at defendant’s house before Miller.

 Defendant argues that it is unlikely that Zantello is lying to help him, given that she sent a letter to defendant the day after she testified against him at his first trial stating that she hated him and hoped that he would die in prison, and she signed the affidavit recanting her testimony against defendant after this.

 Simpson said that he would testify after he was allowed to shower because apparently he had been in the “hole” the night before and had not been allowed to shower. The trial court deemed this to be a refusal to testify. Simpson did not testify even though his counsel warned him on the *479 record that there was a “strong possibility” that he would be charged with perjury if he did not testify and that he was “risking his immunity that was granted to him.” Zantello took the stand and stated that she could not recall any of the events because of her long-term drinking problem. One of the issues that defendant raised on appeal was whether the trial court erred in considering Simpson and Zantello unavailable. Given its holding on the present issue, the Court of Appeals did not address this issue.

 During defendant’s second trial, defense counsel objected to the exclusion of the recanting statements on the basis of MRE 613 (prior inconsistent statements), but not on the basis of MRE 806 (attacking credibility of declarant). However, defendant raised the MRE 806 argument in his motion for a new trial. Although the majority claims that defendant did not even rely on MRE 613 at trial, ante at 460 n 15, the prosecutor has repeatedly conceded to the contrary. See Plaintiff-Appellant’s Application For Leave, pp 4, 15, and Plaintiff-Appellant’s Supplemental Brief, p 2. Further, what remains most significant in this regard is that defendant attempted to introduce the recanting statements and the trial court excluded them, and, as discussed later, this constituted a plain error that justifies a new trial.

 MRE 806 states that a defendant may introduce evidence that attacks the credibility of declarants if this evidence would have been “admissible for those purposes if declarant had testified as a witness.” That is, if the recanting statements would have been admissible to attack the credibility of the declarant if the declarant had testified according to the hearsay statement, they are admissible to attack the credibility of the declarant when only the hearsay statement is admitted. Contrary to the majority’s view, ante at 461 n 16, MRE 806 requires us to assume that the declarant’s testimony would have been consistent with the hearsay statement. Moreover, again contrary to the majority’s view, ante at 461 n 16,1 believe it is “undisputed” that the recanting statements here would have been admissible had declarants testified at trial, particularly given that the prosecutor has not argued otherwise even though this is one of the requirements of MRE 806.

 Although the majority concedes that Vaughn is distinguishable from the instant case, it argues that Grant is also distinguishable from the instant case. Ante at 467-468. While Grant and the instant case are not identical, for the reasons discussed earlier, I believe that Grant is sufficiently similar to be of considerable guidance.

 The majority argues that the recanting statements included irrelevant and unfairly prejudicial content; however, as the majority concedes, any such material could have been redacted. Ante at 463, 465. The key assertions made in the recanting statements were that these witnesses’ prior testimony against defendant was untruthful; these assertions were clearly not irrelevant or unfairly prejudicial and thus should not have been excluded from the jury. In addition, for the reasons discussed in part III (B), I disagree with the majority that the recanting statements were merely cumulative. Ante at 463, 465-466, 473.

 The majority claims that there were only “minor discrepancies” between Mock’s and Barr’s testimony. Ante at 471 n 27. Given that Mock *491 testified that defendant said that he was the one who killed Miller and Barr testified that defendant did not say he was the one who killed Miller, I disagree.

 The prosecutor arguably should be precluded from asserting that the issue is unpreserved given that, in his brief to the Court of Appeals, he conceded that defendant “had brought a motion for a new trial on this basis expressly under MRE 806, and thereby, preserved the issue for appeal” and stated that as “a preserved claim of constitutional error, this Court must determine whether the people have established beyond a reasonable doubt that any error was harmless.” Moreover, the error was arguably properly preserved under MRE 103, which provides:
(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and
(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or
(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.
(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.
*494 Given that the trial court excluded evidence, all that was required to preserve the issue under MRE 103(a)(2) was to make “the substance of the evidence ... known to the court....” Nobody disputes the fact that “the substance of the evidence was made known to the court.” Further, the error arguably denied defendant his right to confront witnesses against him, and thus was arguably of constitutional dimension.
If the error was constitutional, preserved error, the prosecutor would be required to prove that the error was harmless beyond a reasonable doubt. People v Anderson, 446 Mich 392, 406; 521 NW2d 538 (1994). If the error was non-constitutional, preserved error, defendant would be required to prove that it was more probable than not that the error was outcome determinative. People v Lukity, 460 Mich 484, 495-496; 596 NW2d 607 (1999). As discussed in part II, it is unnecessary to determine whether the error was constitutional or non-constitutional, or preserved or unpreserved, because even assuming that it was unpreserved, non-constitutional error, defendant is entitled to relief.